233 F.2d 889
 THE NEW YORK COMPANY, Owner of THE AGRAM,
v.
THE ROBIN DONCASTER, Her Engines, Boilers, Tackle, Apparel, etc., and Seas Shipping Company, Inc., Owner and Operator of The Robin Doncaster, Appellant.
Matter of the Petition of Robert B. WATHEN for Exoneration from and for Limitation of Liability, as Owner of THE RUTH.
Seas Shipping Company, Inc., Individually and as Owner and Claimant of The Robin Doncaster, Appellant.
Petition of Robert B. WATHEN, as Owner of The Ruth for Exoneration from and Limitation of Liability.
The New York Company, Owner of The Agram, Appellant.
 No. 11606.
 No. 11607.
 No. 11635.
 United States Court of Appeals Third Circuit.
 Argued December 20, 1955.
 Decided May 17, 1956.
 
 Thomas E. Bryne, Jr., Philadephia, Pa. (Krusen, Evans & Shaw, Philadelphia, Pa., Winthrop O. Cook, New York City, on the brief), for appellant, Seas Shipping Co., Inc., and The Robin Doncaster.
 Max Taylor, New York City, for Wathen.
 James B. Doak, Philadelphia, Pa. (LaBrum & Doak, Philadelphia, Pa., on the brief), for The New York Co.
 Maurice A. Krisel, New York City, Benjamin F. Stahl, Jr., Philadelphia, Pa. (Krisel, Beck & Taylor, New York City, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., on the brief), for appellee.
 Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.
 STALEY, Circuit Judge.
 
 
 1
 This opinion considers three appeals (Nos. 11,606, 11,607, and 11,635) which have been taken from decrees entered by the district court for the Eastern District of Pennsylvania, following a consolidated trial of three suits which resulted from a collision of vessels in the Delaware river involving the steamship Robin Doncaster, owned and operated by the Seas Shipping Company, Inc., and the barge Agram, owned by the Tug New York Company, which was being towed by the tug Ruth, owned and operated by Robert B. Wathen. Questions raised are whether one of the findings of fact is supported by the evidence in the record and whether certain inland rules of navigation governing the passing of vessels were properly applied. The relevant facts are taken from the district court's findings.
 
 
 2
 Just below Philadelphia, the Delaware river flows in an east-west direction for about two nautical miles. At the eastern end of this stretch, the channel curves in a north-northeasterly direction for three-fourths of a mile, then straightens out and continues for a distance of one and three-fourths miles in a north-northeasterly direction. At the northern end of this one and three-fourth mile stretch, the channel curves in a north-northwesterly direction. The curved portion connecting the east-west segment with the north-northeast segment of the river is called Horseshoe Bend. An imaginary straight line three-fourths of a mile long in the center of the channel beginning at the southern end of the one and three-fourth mile stretch and going upriver is called East Horseshoe Range. The Windy Point Coal Pier is located on the western side of the channel, about six-tenths of a mile north of the southerly end of East Horseshoe Range.
 
 
 3
 At about eight o'clock on the night of January 9, 1952, the tug Ruth with the barge Agram lashed on her starboard side was traveling up the Delaware river (toward Philadelphia) slightly to the right of the center of the channel. As the flotilla approached the curve in the river at Horseshoe Bend, the steamship Mormacpenn, which was approximately 1200 feet astern and on the eastern edge of the channel, signaled for permission to pass the tug and tow. The Ruth did not answer but began to turn to her starboard, or the eastern side of the channel, in order to give the Mormacpenn room to pass on the port side. Meanwhile, the Doncaster was undocking from the northern side of Pier 98, Philadelphia, Pennsylvania, which is located on the western side of the river about 1500 feet north of the point where the river curves in a north-northwesterly direction. After undocking, the Doncaster proceeded downriver on a course which brought her over to the east side of the channel so she could avoid a vessel anchored crosswise just to the west of mid-channel four hundred feet below Pier 98. The district court's findings continue, as follows:
 
 
 4
 "After the tug and tow had proceeded up the river and to the right for a short distance, and were approaching East Horseshoe Range, the Ruth observed the Doncaster off her starboard bow proceeding on the eastern side of the channel at a distance of about 1¼ miles away and showing her green lights. Their courses were so far on the starboard of each other as not to be considered as meeting head and head. The Ruth then sheered slightly toward the center of the channel. The Mormacpenn, having observed the tug and tow's change of course, slowed down, and after proceeding for a short interval on the eastern edge of the channel, signaled with two short blasts indicating her willingness to pass the tug and tow on their starboard side. The Ruth did not respond to this signal either, but maintained her position slightly to the left of mid-channel as she approached or continued up East Horseshoe Range.
 
 
 5
 "Taking into account the position of the Doncaster on the east side of the channel and the Mormacpenn's second signal to pass on the starboard side, the Ruth gave a two-blast signal indicating that she desired to pass the Doncaster starboard to starboard. At the time there was sufficient room on the east side of the channel for the Doncaster to pass safely between the tug and tow and the Mormacpenn in the eastern side of the channel. In the meantime the Mormacpenn, aware of the Doncaster's position, stopped near the eastern edge of the channel to await development.
 
 
 6
 "* * * [T]he Doncaster, which was traveling downstream at a speed of 6 to 7 knots, answered with a one blast signal indicating that she desired to pass port to port — as she began to turn to her starboard with a right rudder of from 10 to 15 degrees. This course was maintained by her for the next four minutes. At the time the Doncaster's rudder was first ordered right, the tug and tow were on her starboard bow and the distance between them was ½ to ¾ of a mile.
 
 
 7
 "After the Doncaster's signal, the tug proceeded a short distance, and when she observed the Doncaster's direction, she gave the danger signal and two indicating that she still desired to pass on the starboard side and that it would be dangerous to do otherwise. At this time the Ruth reduced her engines to half speed.
 
 
 8
 "In response the Doncaster blew the danger signal and one indicating that she still desired to pass port to port. At the time the vessels were 1,500 feet apart.
 
 
 9
 "In answer to this signal, the tug gave the danger signal again. When the Doncaster continued on the same course, the tug reversed her engines full speed astern and signaled with three blasts that her engines were in reverse.
 
 
 10
 "When the tug and the vessel were approximately 500 feet apart, the pilot on the Doncaster ordered the rudder hard right.
 
 
 11
 "At 8:23 o'clock, when the vessels were 200 feet apart and in the vicinity of Windy Point Coal Pier, the Doncaster signaled that her engines were in reverse.
 
 
 12
 "However the Doncaster continued to move forward in a southwesterly direction, and at 8:23½ her bow on the port side, about five feet from her stem, came into collision at an angle of 50 degrees with the stem of the Agram.
 
 
 13
 "No agreement had ever been reached between the Ruth and the Doncaster as to the manner of passing each other.
 
 
 14
 "After the collision, the Doncaster proceeded across the bow of the barge, whose port anchor gouged several of the hull plates on the port side of the Doncaster's bow at about the 24 foot draft mark from just aft the stem to the flare of the bow.
 
 
 15
 "When she cleared the barge, the Doncaster continued in an arc across the western side of the river and went into the slip on the south side of Windy Point Coal Pier, her starboard bow striking the south side of the pier about 350 feet in from the river end at an angle of 30 degrees, and came to a stop, with the aid of her anchors, a few feet from a vessel docked near the shore end of the pier.
 
 
 16
 "The collision occurred at a point slightly to the west of mid-channel and 400 feet south of Windy Point Coal Pier or 100 to 200 feet north of Buoy 39.
 
 
 17
 "At the time of collision the tug and her tow were making headway at no more than 2 knots or just enough speed to maintain steerage, while the Doncaster was traveling at the rate of from 5 to 6 knots — the reversal of her engines having had insufficient time to check her forward speed.
 
 
 18
 "As a result of the collision, the barge Agram was damaged to such an extent that the cost of repairs was greater than her value, and she, therefore, was declared a constructive total loss."
 
 
 19
 The first question raised need not detain us. It is argued that the record contains no evidence to support the district court's finding number 12 that "The Doncaster then proceeded downriver on a course which brought her over to the east side of the channel so that she could avoid a vessel anchored crosswise just to the west side of mid-channel 400 feet below Pier 98 South."
 
 
 20
 The essential fact in finding number 12 and the only one that could materially affect other findings is that the Doncaster proceeded down-river on a course which brought her over to the east side of the channel, and as to this, a review of the evidence convinces us that the district court's finding was correct. Speculative inferences may support a contrary conclusion, but the record does not. Certainly not sufficiently to leave this Court with a definite and firm conviction that the district court erred. See McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20.
 
 
 21
 The other question raised concerns the district court's application of the inland rules of navigation.
 
 
 22
 Article 25 of the inland rules, 33 U. S.C. § 210, provides that "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." The district court concluded that although the Ruth was slightly to the left of mid-channel at the time of the collision, she had not violated Article 25, because it would not have been safe and practicable for her to have kept over to the eastern or her right side of the channel.
 
 
 23
 The district court's conclusion that it would not have been safe and practicable for the Ruth to keep to the right is questioned, and it is argued that considerations of convenience rather than safety and practicability caused the Ruth to proceed toward mid-channel, and therefore she should not be completely absolved from liability. We cannot agree with this contention.
 
 
 24
 It is true that when the Ruth and her tow came upon the scene they were near mid-channel. An attempt to get nearer the eastern edge of the channel was made by the Ruth but she changed her mind and veered back to her left when she observed the Doncaster on the eastern side of the channel. The Doncaster's position was in violation of Article 25. The Ruth, observing the Doncaster coming down-river on the eastern side of the channel and knowing that the Mormacpenn was astern and in the eastern side of the channel, cannot be said to have used poor judgment in deciding to remain in the center of the channel. To have proceeded to the right in the path of the oncoming Doncaster certainly would not have been safe and practicable. This is particularly true because the Ruth at that time could not have anticipated that the Doncaster would attempt to cross over to the western side of the channel where she belonged and effect a port-to-port passing with the Ruth. Although a port-to-port passing of vessels is contemplated by Article 18, Rule I, 33 U.S.C. § 203, that rule also provides: "But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other." The district court concluded, and we think correctly, that when the Ruth observed the Doncaster approaching on the eastern side, the relative positions of the vessels was such that a starboard-to-starboard passing was called for and could have been safely effected. Under those circumstances, the Ruth was justified in expecting that the Doncaster would pass on the starboard side. The only safe and practicable course for the Ruth was to stay away from the eastern side of the channel. The Doncaster's improper and unsuccessful attempt to cross over to her right resulted in a collision for which the Doncaster must be held responsible. See Griffin on Collision § 32, p. 75 et seq. (1949) and cases cited therein.
 
 
 25
 We note also that Article 27, 33 U.S. C. § 212, provides that in obeying the inland rules, "due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." Even had the Ruth committed a technical violation of Article 25 (although we do not think so), her actions would have been justified since the perilous situation created by the Doncaster's position called for a departure from rules in order to avoid immediate danger.
 
 
 26
 For the foregoing reasons the decrees appealed from in Nos. 11,606, 11,607 and 11,635 will be affirmed.